**UNITED STATES DISTRCIT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| Digital Art Services, Inc., on its own behalf and on behalf of a class of similarly situated persons and entities, ) ) ) ) | **Index No.: 07-cv-8592-LAP** |
| Plaintiff, ) ) | |
| - against - ) ) | **AMENDED COMPLAINT** |
| VERIZON COMMUNICATIONS INC., a Delaware Corporation, GTE NET LLC, d/b/a VERIZON ONLINE LLC, a Delaware Limited Liability Company, and VIAMEDIA INC., a New York Corporation, ) ) ) ) ) ) | |
| Defendants. ) ) | |



Plaintiff Digital Art Services, Inc., on its own behalf and on behalf of a class of similarly situated persons, by and through its undersigned counsel, as and for its Amended Complaint in this action, avers as follows:

## Nature of the Action

1.      This action arises from Defendant Verizon's fraudulent overstatement of the number of subscribers to its fiber-optic cable service (known as "FiOS"), which Verizon used to set inflated prices for advertising sold to the Plaintiff and the Plaintiff Class. Verizon's internal documents show, and Verizon has now admitted, that Verizon has a policy of inflating the number of its reported FiOS subscribers by including prospective customers – who were *not* actual subscribers, and may never have become actual subscribers – in reports of actual FiOS subscribers. Verizon's documents show that its fraudulent overstatements increased sharply during 2007, such that by July 2007 a full *33%* of reported FiOS subscribers in the New York region were not actual subscribers.

2.      When confronted by Plaintiff with Verizon's own documents – which Plaintiff discovered by accident while meeting with Verizon's agent, Defendant Viamedia, to complain about the poor response to its FiOS advertising – Defendants admitted their practice of including what they refer to as "pending" customers in their subscriber reports, but claimed that it was reasonable to do so because the pending customers are converted to active subscribers within a standard of two weeks.  Verizon's documents flatly contradict that assertion, however, because the number of "pending" subscribers in a given month is far greater than the number of customers added in the following month – and the reality is that many prospective subscribers have waited up to ten months for their service to become active.

3.      More recently, in response to Plaintiff's complaints, Viamedia sales managers have taken to explaining the difference between actual and pending subscribers, yet they have continued to use Verizon's inflated and false subscriber reports when they do so.  An example of this continuing fraud is reflected in a recently-recorded telephone conversation, a true and correct transcript of which is attached hereto as Exhibit 1.

4.      Plaintiff therefore seeks damages based on the amount of Verizon's fraudulently-inflated customer numbers, and other relief, as set forth below.

**Parties**

5.      Plaintiff Digital Art Services, Inc. ("Digital") is a New York corporation, with its principal place of business at 3500 Sunrise Highway, Great River New York 11739.

6.      Defendant Verizon Communications, Inc. (referred to herein as "Verizon Communications") is a Delaware corporation, with its principal place of business in New York City.  Verizon Communications owns and operates Defendant Verizon Online.

7.      Defendant GTE Net LLC, d/b/a Verizon Online (referred to herein as "Verizon Online" and, together with Verizon Communications and it's agent Viamedia, as "Verizon") is a Delaware limited liability company licensed to do business in New York State, and a wholly-

owned subsidiary of Verizon Communications.  On information and belief, the actions of
Verizon Online with regard to reporting its subscriber numbers were directed and controlled at
all relevant times by Verizon Communications.

8.      Defendant Viamedia is, on information and belief, a New York corporation with
its principal place of business located at 220 Lexington Green Circle, Suite 300, Lexington,
Kentucky 40503.  Since 2005 Viamedia has served as the sales agent for Verizon Online's FiOS
service.  In its capacity as agent, Viamedia was aware of Verizon's policy of including
"pending" and actual subscribers in its reports of "total" subscribers, and knowingly participated
in the fraud alleged herein by disseminating Verizon's fraudulently overstated subscriber reports
to Plaintiff and the Plaintiff Class.

### Jurisdiction and Venue

9.      This action is being filed in federal court pursuant to Section 4(a) of the Class
Action Fairness Act of 2005, codified at 28 U.S.C. § 1332(d)(2).  This is a class action with over
100 proposed class members located in several states (California, Connecticut, Florida,
Maryland/D.C., Massachusetts, New Jersey, New York, Texas, Pennsylvania, and Virginia).
The amount in controversy, exclusive of costs, exceeds five million dollars ($5,000,000).

10.      This Court has jurisdiction over Verizon Communications because Verizon
Communications' principal place of business is in New York City.

11.      This Court has jurisdiction over Verizon Online because Verizon Online is
licensed to do business in New York State.

12.      This Court has jurisdiction over Viamedia because Viamedia regularly conducts
business in New York State, including engaging in transactions relating to the subject matter of
this action.

13.      Venue in this district is proper because Verizon Communications' principal place
of business is in New York City and, on information and belief, Verizon Online's principal place

of business is in New York City, and Verizon Online and Viamedia are subject to personal jurisdiction in this district.

**Facts Common to All Claims**

14.     Since about 2005, Verizon has been rolling out its fiber-optic cable television, telephone and internet access service, called "FiOS", in markets located in nine states and the District of Columbia:  Baltimore/Washington D.C., Boston, Philadelphia, Los Angeles, New York/New Jersey, Tampa, Dallas/Fort Worth, Richmond, and Norfolk.  Verizon has publicly stated that the FiOS service is an important strategic initiative for the company.  Earlier this year, for example, Verizon organized and heavily publicized the enrollment of its purported 500,000[th] FiOS subscriber.

15.     Until Plaintiff's recent discovery of Verizon's internal documents, however, Plaintiff and the Plaintiff Class were not aware of any such fraudulent overstatement of Verizon FiOS subscribers, and believed that Verizon's published subscriber data was a true and accurate report of actual FiOS subscribers as of the dates set forth on the reports.  In fact, those reported numbers were false and inflated, since they included prospective subscribers who might not become actual subscribers until weeks or months later.

16.     Specifically, in 2005, Plaintiff purchased $916,000 of advertising on the Verizon FiOS service.  Verizon intended and understood that Plaintiff would use Verizon's subscriber reports to sell specific portions of the advertising time that Plaintiff had purchased to various advertisers in the New York Metropolitan region, and Verizon agreed to give Plaintiff updated reports regarding the number of its subscribers during the term of the contract.

17.     Thereafter, and continuing up through August 2007, Plaintiff received monthly and quarterly reports from Verizon setting forth the number of purported FiOS subscribers. Plaintiff relied on those reports, and passed on those reports to various other advertisers to whom Plaintiff was selling advertising on the FiOS service.

18.    At no time until late August 2007 did Defendants disclose to Plaintiff that Verizon was following a policy of including "pending" subscribers – who did not yet have the service – in its reports of actual FiOS subscribers.  Tellingly, after Plaintiff confronted Defendants with Verizon's internal reports, which distinguished between "active" FiOS subscribers and "pending" subscribers, Verizon has not furnished Plaintiff with a September 2007 report of its FiOS subscribers, and Viamedia's sales representatives have begun to purport to distinguish between "actual" and "pending" subscribers in their conversations with prospective advertisers – while still using the fraudulently inflated subscriber numbers from Verizon's old reports.

19.    Verizon also never disclosed to Plaintiff that the percentage of its reported subscribers who were "pending" customers was actually *increasing* during 2007.  These figures are detailed on Exhibit 2 attached hereto, which shows the following data for the New York region:

|          | AREA   | ACTIVE | PENDING | TOTAL   |
|----------|--------|--------|---------|---------|
| **Q2 FINAL** | NY DMA | 77,869 | 38,059  | 115,955 |
| **JUNE**     | NY DMA | 69,355 | 30,987  | 100,322 |
| **MAY**      | NY DMA | 65,607 | 20,302  | 85,909  |
| **APRIL**    | NY DMA | 61,677 | 17,161  | 78,838  |

20.    Thus the percentage of Verizon FiOS's total reported subscribers who were actually "pending" subscribers increased from 22% at the beginning of April 2007 to 33% by the end of June 2007.  Moreover, the rate of increase of "pending" subscribers far outstrips the increase in "active" subscribers:  "active" subscribers increased by 16,192, or 26%, but "pending" subscribers increased by 20,898, or *122%*.

21.    The sharply-rising number of "pending" customers amplified the damage caused by Verizon's fraud because it inflated the reported rate of growth of the subscriber base.

Defendants have marketed the Verizon FiOS service to Plaintiff as a new service that Verizon was aggressively rolling out, with the plan and intention of sharply increasing the number of subscribers each month. The rates paid by Plaintiff and members of the Plaintiff Class were based on Verizon's representations regarding its rapid growth. By including ever-increasing numbers of "pending" subscribers, Verizon has sharply overstated the rate of growth of its subscriber base, inducing Plaintiff and the Plaintiff Class to pay much more than they would have paid otherwise (if they chose to advertise on the service at all), because the number of actual subscribers at any point in the future will be much less than Plaintiff and the Plaintiff Class were led to believe. Examples of Verizon's projections which include overstated rate of growth of the FiOS subscriber base are attached hereto as Exhibit 3.

22.     Plaintiff and the Plaintiff Class relied on Verizon's reported number of subscribers as a report of *active* subscribers in agreeing to enter into its contracts with Verizon, and in determining the price they would pay for that advertising. Plaintiffs' reliance was reasonable – indeed, it was absolutely standard in the advertising industry, which relies heavily on reported subscriber numbers to price advertising. Had Defendants honestly disclosed Verizon's actual FiOS subscriber numbers, as well as the sharp rate of increase in "pending" customers, Plaintiffs would not have purchased FiOS advertising, or would not have paid the rates they paid for FiOS advertising.

23.     As an example of the Plaintiff Class' reliance on Verizon's subscriber reports, Attached hereto as Exhibit 4 is a pricing sheet for advertising time from Verizon's authorized agent, Viamedia, which shows that the pricing for advertising time was a function of the number of subscribers. Verizon's fraud in overstating the number of subscribers indisputably meant that purchasers of advertising time were paying for FiOS subscribers who did not exist.

24.     Verizon's fraud was not discovered until recently, when Plaintiff met with Viamedia executives to complain about poor customer response to the advertising he had

purchased.  During that meeting Plaintiff's principal saw an internal Verizon report that separated out its reported subscribers into "active" and "pending" customers; Plaintiff's principal pointed out the document and demanded an explanation.  Plaintiff was then told by Viamedia, Verizon's agent, that the difference was not material because by the time an advertisement ran, pending subscribers would be converted to actual service – since it usually took two weeks to convert pending customers to actual customers, and never more than a month.

25.    Verizon's "conversion rate" excuse has since been repeated by other representatives of Defendants in several meetings and phone conversations over the past few weeks, responding to Plaintiff's concerns.  For example, in the telephone conversation recorded and attached hereto as Exhibit 1, the Viamedia representative insists that Verizon is always able to convert pending subscribers to active subscribers within a month, when the reality is that many subscribers have waited several months – some up to ten months – for their service to be activated.

26.    Defendants also acknowledged, in conversations preceding the recorded conversation, that Verizon has a policy and practice of including "pending" FiOS subscribers in its public subscriber sales reports, and defended that practice on the grounds that the "pending" subscribers are all converted to actual subscribers within two weeks.

27.    Verizon's own documents show that Defendants' explanations for Verizon's reporting practices are false.  The disparity between the number of "pending" customers in a given month and the number of "actual" subscribers shows that most of the pending customers never become actual subscribers – or, alternately, that they take months to actually receive the service (during which time many class members' ads will have already run).  For example, Verizon's internal report shows that the number of actual and pending subscribers in April 2007 was higher than the number of actual subscribers as of the end of June 2007, *three months later*. *See* Exhibit 2 hereto.

28.     Until Plaintiff's inadvertent discovery, Defendants concealed and failed to disclose to Plaintiff and the Plaintiff Class that Verizon had a company-wide policy of inflating its Verizon FiOS subscriber figures to include "pending" subscribers.

29.     If Defendants had not knowingly and materially overstated and concealed their actual FiOS subscriber figures, Plaintiff and the class members would have paid lower advertising rates and lower amounts for the advertising time on the Verizon FiOS service, or would not have advertised on FiOS, and would have entered into other advertising contracts that would have earned them greater sales revenue than they achieved from Verizon FiOS.

**Class Allegations**

30.     Plaintiff brings this action on behalf of itself and the class of similarly situated persons who purchased advertising time on the Verizon FiOS service since its inception in 2005.

31.     Excluded from the Plaintiff Class are employees, officers, directors, and sales representatives of the Defendant's and Plaintiff's counsel.

32.     Plaintiff believes that the Class includes at least several hundred advertisers.  The members of the class are so numerous that joinder of all members is impracticable.

33.     Common questions of law and fact exist as to all members of the Plaintiff Class and predominate over questions affecting individual members of the class.  Common questions include:

(a)  Whether Verizon inflated its FiOS subscriber data by including "pending" customers as well as actual customers in its reports.

(b)  Whether Verizon intended that purchasers of advertising on its service would rely on Verizon's reported subscriber data in agreeing to purchase advertising on the service, and in pricing those purchases.

(c)  Whether Viamedia knowingly participated in Verizon Communication's and Verizon Online's fraud by pricing advertising sales on the basis of subscriber reports

that Viamedia knew to be false and fraudulent, because they included "pending" subscribers, and perpetuated the fraud by continuing to repeat Verizon's fraudulently overstated subscriber numbers as "actual" subscribers, up to the present date.

(d)  Whether Verizon's acts and omissions with respect to Plaintiff and the Class Members constitute a cause of action for common-law fraud.

(e)  Whether Verizon's acts and omissions with respect to Plaintiff and the Class Members constitute a cause of action for common-law unjust enrichment.

(f)  Whether the Plaintiff and the Plaintiff's Class incurred damages as a result of Verizon's fraud, and if so, the amount of damages to be recovered by the class.

34.    Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained counsel competent and experienced in class action litigation, and Plaintiff has no interests antagonistic to those of the Class Members.

35.    A class action is an appropriate method for fairly and efficiently adjudicating this controversy because, among other things, joinder of all members of the class is impracticable, and many if not most members of the class cannot vindicate their rights by individual suits because their damages are small relative to the burden and expense of litigating individual actions against Defendants.

## Count I

## Fraud

36.    Plaintiff incorporates the allegations in the foregoing paragraphs 1-35 as if specifically set forth herein.

37.    From the inception of its FiOS service, Defendants falsely represented one of the critical attributes of the Verizon FiOS service – the number of actual FiOS subscribers at any given time – to Plaintiff and the Plaintiff's Class.

9

38.    Defendants knew at the time they made their representations to members of the Plaintiff's Class regarding the number of FiOS subscribers that those representations were false and inflated, including "pending" subscribers who might not become actual subscribers for months, if ever.

39.    Defendants knew that Plaintiff and the Class Members would believe and rely upon the false FiOS subscription data in deciding to purchase Verizon FiOS advertising, and in deciding what to pay for that advertising.  Plaintiff and the Plaintiff's Class did so rely, and their reliance was not only reasonable under the circumstances, it was in accord with longstanding custom and practice in the industry.

40.    But for Defendants' fraudulent overstatement of FiOS subscriber numbers, Plaintiff and the Plaintiff's Class would not have purchased advertising on the Verizon FiOS service, or would have entered into different contacts, at materially lower prices, reflecting the lower subscriber numbers and lower rate of growth relative to the service.

41.    Defendants' actions thus proximately caused damages to Plaintiff and the Class Members.  Plaintiff and the Class therefore seek actual and compensatory damages, in an amount to be determined at trial, and such exemplary and punitive damages as may be allowed by the state law applicable to their fraud claims.

## Count II

## Unjust Enrichment

42.    Plaintiff incorporates the allegations in paragraphs 1-35 and 36-41 as if specifically set forth herein.

43.    Defendants have been unjustly enriched by the sums they illicitly recouped from Plaintiff and the Plaintiff's Class through their wrongful conduct as alleged herein, which arose

from substantially uniform contracts implied in fact between the parties, which based the value of Verizon FiOS advertising on the number of actual subscribers to the service.

44.    Plaintiff and the Plaintiff's Class engaged in substantially similar conduct with the Defendants, whereby they remitted monies to Verizon, directly or indirectly through its authorized agents, for Verizon's benefit, in exchange for the right to place advertisements on the Verizon FiOS service as alleged herein.

45.    The amount of money paid by Plaintiff and the Plaintiff's Class Members, and received by Defendants, for advertising time during the class period exceeds the amount to which Defendants were entitled, in that Verizon's advertising rates were based (at least in part) on the overstated FiOS subscription data, as alleged herein.

46.    As a result, Defendants have unjustly retained the amount of monies that Plaintiff and the Class Members overpaid due to Verizon's overstatement of the FiOS subscriptions, to Plaintiff and the Class Members' detriment; and Defendants' retention of such benefits violates the principles of justice, equity, and good conscience.

WHEREFORE, Plaintiff respectfully requests this Court enter judgment against Defendants as follows:

(a)    certifying the Class as defined above and appointing Plaintiff as the representative class Plaintiff and appointing Plaintiff's attorneys as Class Counsel;

(b)    finding that Defendants Verizon Communications, Inc., GTE Net LLC, d/b/a Verizon Online, and Viamedia Inc., and each of them, have committed fraud against Plaintiff and the Plaintiff's Class, with damages as determined at trial;

(c)    finding that Defendants Verizon Communications, Inc., GTE Net LLC, d/b/a Verizon Online, and Viamedia Inc., and each of them, have been unjustly enriched, in an amount to be determined at trial;

(d)     awarding Plaintiff and the Plaintiff Class interest and exemplary or punitive

damages as appropriate and permitted under the state law applicable to their individual

advertising contracts, together with reasonable attorneys' fees and costs; and

(e)     such other and further relief that the Court deems just and proper.


New York, New York
December 19, 2007

HAYES & MALONEY LLP

By: _Andrew J. Hayes_____

Andrew W. Hayes (AH-2570)
1 Rockefeller Plaza, Suite 1005
New York, N.Y. 10020
212-554-3120

And

LEEDS MORELLI & BROWN P.C.
Jeffrey Brown (JB-5177)
1 Old Country Road
Carle Place, N.Y.
516-873-9550

Attorneys for Plaintiff

1

2

3

4

5

6

7

8

9

10

11      # PROSPECTIVE ADVERTISER

12      # &

13      # VIAMEDIA REP.

14

15      # TELEPHONE CONVERSATION

16

17

18

19

20

21

22    Transcription Service:    Esquire Deposition Services

23

24

October 2, 2006                                                                 2

```
 1        VIAMEDIA REP.: Hey, how are you doing?

 2        PROSPECTIVE ADVERTISER: Fantastically, and yourself?

 3        VIAMEDIA REP.:  Pretty good.  Pretty good.

 4        PROSPECTIVE ADVERTISER: Good.

 5        VIAMEDIA REP.:  So, I apologize for the

 6   (unintelligible) phone messages.  You were kind of thrown

 7   all over the country here.

 8        PROSPECTIVE ADVERTISER: Yeah, I was, you know -- I

 9   had some people telling me that they couldn't even help me

10   but once I got to the right person, I guess I -- it was

11   great, that they referred me to you guys or you guys

12   called me back within 24 hours.  So --

13        VIAMEDIA REP.:  Okay.  Great.  Great.

14        PROSPECTIVE ADVERTISER: So it's a question of just

15   getting to the right people within Verizon but --

16        VIAMEDIA REP.:  Well, yes, I mean because we are --

17   what we are is we are the company -- our company's name is

18   Viamedia and we are contracted out by Verizon FiOS TV to

19   help them help their customers advertise on their system.

20        PROSPECTIVE ADVERTISER: Okay.

21        VIAMEDIA REP.:  So basically we sell the commercial

22   air time for them.

23        PROSPECTIVE ADVERTISER: Okay.

24        VIAMEDIA REP.:  Yes.
```

```
 1        PROSPECTIVE ADVERTISER: Okay.

 2        VIAMEDIA REP.:  And that's what we do for them.   And

 3   when you had gotten -- one of the reasons why I asked 443,

 4   where is that?

 5        PROSPECTIVE ADVERTISER: That was from Maryland, when

 6   I was living in Maryland but I moved back up here up to

 7   New York.  I just kept the same number.

 8        VIAMEDIA REP.:  Okay.  The reason why that you were

 9   sent to Maryland is because of the 443 number.  They

10   thought you were living in Maryland and it was --

11        PROSPECTIVE ADVERTISER: I had a feeling it had

12   something to do with being routed to that office but once

13   -- even when I got there, you know, they couldn't tell me.

14    But bottom line, I'm glad to (unintelligible) to you.

15        VIAMEDIA REP.:  Yes, definitely.  Let me give you my

16   name and number, although you have obviously my name.  And

17   my name is [name of Viamedia Rep.].  I'm the local sales

18   manager and one of the national sales managers here for

19   the New York region.

20        PROSPECTIVE ADVERTISER: Uh-huh.

21        VIAMEDIA REP.:  The New York region which includes

22   New York, New Jersey and Long Island.  The account rep.

23   who I will probably have you working with depending upon

24   what it is that you need will be [name of account rep.],
```

October 2, 2006                                                    4

```
 1  but I will be your interface for now until we find out

 2  exactly what it is you need.

 3          PROSPECTIVE ADVERTISER: Yes, okay.

 4          VIAMEDIA REP.:  Now --

 5          PROSPECTIVE ADVERTISER: Well, right now, I'm calling

 6  just to get some information.  I've got some decisions to

 7  make, you know, This is not a foregone conclusion in a lot

 8  of -- I've got a lot of moving parts here, you know?

 9          VIAMEDIA REP.:  Tell me.

10          PROSPECTIVE ADVERTISER: I'm talking about getting

11  funding from friends, you know, and that's always a little

12  sketchy.

13          VIAMEDIA REP.:  I got it.

14          PROSPECTIVE ADVERTISER: And, you know, but I had

15  somebody who -- you know, he's like in video productions,

16  so he could get me a TV spot, he assures me of like within

17  a week or two.

18          VIAMEDIA REP.:  Right.

19          PROSPECTIVE ADVERTISER: But, you know, I mean I don't

20  have a lot of experience with this sort of thing, so --

21          VIAMEDIA REP.:  That's fun.

22          PROSPECTIVE ADVERTISER: But, I mean, his idea was,

23  you know, you guys are starting up.  You might have some

24  attractive rates but I don't know what --
```

October 2, 2006                                                                      5

```
1        VIAMEDIA REP.:  We definitely will have attractive

2    rates.

3        PROSPECTIVE ADVERTISER: Great.

4        VIAMEDIA REP.:  Anyway, we have 15 different networks

5    throughout --

6        PROSPECTIVE ADVERTISER: Uh-huh.

7        VIAMEDIA REP.:  First of all and foremost, where is

8    your (unintelligible).  Let me just tell you straight off

9    the bat that for a 30 second commercial you're looking for

10   anything between $25 and $50 for one 30 second commercial.

11    And depending upon how long and what type of brand names

12   you're putting together, we could maybe even go a little

13   bit lower than that.

14       PROSPECTIVE ADVERTISER: Oh, from what I guess -- yes,

15   if I buy more spots, you will give me a better per spot

16   price.

17       VIAMEDIA REP.:  Yes, because further down the road,

18   we have more inventory.

19       PROSPECTIVE ADVERTISER: Okay.

20       VIAMEDIA REP.:  So for instance, if you wanted to

21   advertise next week, it would cost you probably $50 per 30

22   second spot, depending upon what network you want to be on

23   but if run it through next week and next year, which I

24   would advise, not in order to make more money but in order
```

```
 1   because our subscriber level is going to be going up, and

 2   the cost of advertising next week is going to be a lot

 3   less than the cost of advertising for next year when we

 4   increase our subscriber base by 100 percent, 200 percent,

 5   300 percent.  So right now --

 6        PROSPECTIVE ADVERTISER: So if I commit now to buying

 7   time for next year, I -- I lock in at a low price and then

 8   if you get more subscribers --

 9        VIAMEDIA REP.:  It will shoot up.

10        PROSPECTIVE ADVERTISER: -- I get --

11        VIAMEDIA REP.:  You get more value.  And not only

12   that, but we can put a two week information policy for you

13   in there.  That way, if God forbid something happens and

14   you have to change your business or something happened and

15   you don't want to do your business anymore or something

16   happened to your business, God forbid, or you, You know,

17   we're not going to expect you to pay for the whole year.

18        PROSPECTIVE ADVERTISER: Okay.

19        VIAMEDIA REP.:  Two week cancellation policy on

20   anything written and you're off within two weeks.

21   (unintelligible).  We have 50 different networks and I can

22   send you over the information, e-mail it to you or put

23   some more information in terms of the networks.

24        PROSPECTIVE ADVERTISER: Uh-huh.
```

1        VIAMEDIA REP.:  What we need to talk about are

2   several different things.

3        PROSPECTIVE ADVERTISER: Uh-huh.

4        VIAMEDIA REP.:  The first being the location of your

5   business and who it is and where it is you're going to be

6   drawing our consumer base from.

7        PROSPECTIVE ADVERTISER: Yes.  Well I am in Queens and

8   I expect that we'll have some business in Queens, New York

9   City area but also out on Long Island.  You know, it's

10  convenient to get to the highways and probably, like North

11  Jersey.

12       VIAMEDIA REP.:  Okay.  That's perfect.

13       PROSPECTIVE ADVERTISER: Okay.

14       VIAMEDIA REP.:  That's perfect because we have a

15  subscriber base of about -- right now there's a current

16  subscriber base of about 55,724 in New Jersey, northern

17  New Jersey.  And there's 65,711 in Queens, New York.

18       PROSPECTIVE ADVERTISER: Okay.  Is that like --

19       VIAMEDIA REP.:  That's -- go ahead, you were starting

20   to --

21       PROSPECTIVE ADVERTISER:  But what exactly does that

22  represent?

23       VIAMEDIA REP.:  That represents the number of

24  households that are either active or going to be receiving

October 2, 2006                                                              8

1    Verizon FiOS.  There are 50,000 -- or about 51,000 in New

2    Jersey that are currently active subscriber households.

3    When I say subscriber, I mean one household which is on

4    average 2.3 individuals.

5         PROSPECTIVE ADVERTISER: Right.  Okay.

6         VIAMEDIA REP.:  A subscriber is a household that is

7    getting -- receiving their video, their fiber optic cable

8    from Verizon FiOS.  So there's 50,994 in New Jersey

9    currently and there is really as of June 30.  So I am sure

10   the number have gone up.

11        PROSPECTIVE ADVERTISER: Okay.

12        VIAMEDIA REP.:  And 14,000 pending, meaning pending

13   are people who are signed up and we are getting to their

14   houses and installing.

15        PROSPECTIVE ADVERTISER: Okay.

16        VIAMEDIA REP.:  And the --

17        PROSPECTIVE ADVERTISER: And what's like the -- how

18   long does that take?  I mean --

19        VIAMEDIA REP.:  It should -- Verizon -- typically

20   they pride themselves on having a two week turnaround.

21   Because of the interest and because of the technology and

22   the fact that we run the fiber optic from the street into

23   the home and then wire the entire home, it -- excuse me --

24   depending upon when You signed up, we're finding that it's

1    anywhere between two and three to four weeks some times so

2    that turnaround time is not as quick.  Plus, we -- Verizon

3    FiOS  is trying to hire the best techs possible and with

4    so many pending, you want to make sure that You have good

5    quality people going into people's homes and wiring them

6    sufficiently, effectively and efficiently.

7         PROSPECTIVE ADVERTISER: Okay.

8         VIAMEDIA REP.:  So you're looking at anywhere

9    between, You know, two weeks minimum and a month maximum.

10    Don't quote me on those numbers but, You know, like if

11   You were to call Verizon FiOS today, I have no idea what

12   they would tell you.  They would tell you probably two

13   weeks minimum, one month maximum.  But they've told us as

14   a company, there is a two week turnaround time to go from

15   active to pending.

16        PROSPECTIVE ADVERTISER: Sure.

17        VIAMEDIA REP.:  Because obviously, you know --

18        PROSPECTIVE ADVERTISER: If I have to figure what this

19   is going to cost me, I have to figure like what I can take

20   to the bank now.

21        VIAMEDIA REP.:  Absolutely.

22        PROSPECTIVE ADVERTISER: I mean, I can't assume you're

23   going to keep up, You know --

24        VIAMEDIA REP.:  Well, I could tell you that we would

1    guarantee You the numbers based on -- the projected

2    numbers that we're giving you are projected numbers that

3    Verizon FiOS is giving their shareholders.

4        PROSPECTIVE ADVERTISER: Uh-huh.

5        VIAMEDIA REP.:  Which means that they're giving those

6    numbers to Wall Street, which means that they are --

7        PROSPECTIVE ADVERTISER: Okay.  Wall Street's

8    interest, and, You know, like that -- what they care about

9    there is how much they're getting paid.  I don't care how

10   much Verizon is getting paid for their households, I want

11   the eyeballs.

12       VIAMEDIA REP.:  Absolutely.  And that's what we're --

13   one of the reasons why I say that they're giving them to

14   Wall Street is because if they say that they're going to

15   move up the number of subscribers, if they misrep.resent

16   the number of subscribers that they are projecting to Wall

17   Street, then that might misrep.resent the stock price

18   which might cause the top executives to go to prison.

19   That's one of the reasons why we have -- we are very,

20   very, cautious about the number -- the projected number

21   that we send out.

22       PROSPECTIVE ADVERTISER: Uh-huh.

23       VIAMEDIA REP.:  We have over projected and I could

24   send you information on this, literally by about 150

1    percent a month.  Like for instance, as of the first

2    quarter -- because we project by quarter, the third

3    quarter projection, okay, for New York, meaning we

4    consider New York, New Jersey to be one system.  They've

5    got one system together.  Now you could buy them

6    separately and we could give you costs for them

7    separately.  But if You take New York -- and this is how I

8    have the numbers, take New York, Long Island and

9    Westchester, they were projected the second quarter to be

10   60,400 and we were over 85,000 actual.  And then in the

11   third quarter, we projected to be 114,000 and we were at

12   115,000 and in fourth quarter, by December '07, we are

13   projected to get 177,703 total number of Verizon FiOS

14   subscriber households.  And we're currently at what, 65 or

15   66 and 66 -- so that's what, 66 plus 66 is, you know, 132

16   currently.

17       So you know, the record projected amount is about 245

18   to 250 per meaning 250,000 subscribers by December '08 in

19   New Jersey and 250,000 subscribers.  Now that's just a

20   number that we have been -- that's being thrown around a

21   little bit.  We haven't gotten the official projected

22   numbers yet.  So that's not official.

23       PROSPECTIVE ADVERTISER:  So that's what -- that's for

24   the end of next year, for like more than a year from now.

```
 1        VIAMEDIA REP.:  Exactly.

 2        PROSPECTIVE ADVERTISER: That's the end of next year.

 3        VIAMEDIA REP.: That's through the end of next year

 4   but you could see what the growth pattern is.  And I would

 5   not expect you and I do not expect you to buy your

 6   advertising or I would not expect you and I would not

 7   advise You in any way, shape or form, you shouldn't be

 8   buying based on what it -- where we're going to be going

 9   but you also have to look at where we are.

10        PROSPECTIVE ADVERTISER: (unintelligible)

11        VIAMEDIA REP.:  So, (unintelligible).

12        PROSPECTIVE ADVERTISER: I mean, that's all well and

13   good to talk about 12 months out but I am really looking

14   at three to six months

15        VIAMEDIA REP.:  Yes.

16        PROSPECTIVE ADVERTISER: -- because that's all -- you

17   know, I mean even -- I don't know what the pricing's going

18   to be but you still might even be too much for

19   (unintelligible).  So, you know --

20        VIAMEDIA REP.:  Okay.  So no, I understand.

21        PROSPECTIVE ADVERTISER: So, You know --

22        VIAMEDIA REP.:  Well one of the things is You know,

23   especially with your type of business, a lot of people,

24   one of the things to realize is what people utilize and we
```

```
 1   have to see -- you have to see whether or not

 2   (unintelligible) cable specifically.  Now cable

 3   specifically is good for your business and we have to see

 4   if that medium is something that you should be going into

 5   with the business because people are not going to see your

 6   spot and then suddenly, oh, I need to get something

 7   catered.

 8       PROSPECTIVE ADVERTISER: Right.

 9       VIAMEDIA REP.:  You know, I get a lot of people --

10   it's a branding medium.  So what we need to do is come up

11   with a schedule that is going to be running over a six

12   month to a year long period of time and running a larger

13   umber of units within times that your business segment is

14   not or is -- you want a fish when the fish are jumping, do

15   you know what I mean -- we have to make sure that, You

16   know like You are the expert in your business so if it's

17   seasonal, which it may or may not be, which it probably is

18   in terms of summer and spring or maybe the holidays --

19       PROSPECTIVE ADVERTISER: Right.

20       VIAMEDIA REP.:  So you might want to -- you want to

21   definitely have a few spots going when there's not a high

22   season but you want to have a lot of spots going at a

23   certain number of time.  The key is to keep it going and

24   to create a name so when someone thinks oh, I need to have
```

1   a caterer --

2        PROSPECTIVE ADVERTISER: I'll come to mind.

3        VIAMEDIA REP.:  You'll come to mind.  Like for

4   instance, I have a -- and this is just a for instance, I

5   have some clients that have bathroom redecorating and

6   they're like well we ought to do a two week test.  And I'm

7   like well, I can't do a two week test for you because you

8   know, someone is not going to see your commercial and say,

9   oh, I'm going to spend $20,000 to remodel my bathroom.

10       PROSPECTIVE ADVERTISER:  Right.

11       VIAMEDIA REP.: The key is this -- the first and

12  foremost thing is this the medium and it should be

13  something that you should be branding and utilizing as an

14  addition to your other media outlets, whatever that may

15  be, whether you are going to plan doing a newspaper,

16  whether you're planning on doing Time Warner, or whether

17  you're planning on doing Cablevision but utilizing us to

18  make the phone ring tomorrow, I would suggest to you that

19  that is not what we are utilized for.  We are utilized as

20  a branding campaign.

21       PROSPECTIVE ADVERTISER: Okay.  No, I can appreciate

22  that.

23       VIAMEDIA REP.:  Okay.

24       PROSPECTIVE ADVERTISER:  And you want me to kind of

1  know going in that going in --

2      VIAMEDIA REP.:  Absolutely.

3      PROSPECTIVE ADVERTISER: -- what the expectations

4  should be.

5      VIAMEDIA REP.:  Well the funny thing is is if we can

6  discuss this after we're discussing what you need, I need

7  to have a party catered with this September.

8      (Laughter)

9      VIAMEDIA REP.:  Believe it or not and I don't know

10  whether or not you're currently in a position or you might

11  know someone in Manhattan that could possibly help me.  I

12  have -- you know, I don't have a big budget but I could

13  tell you a little bit more about what my needs are also,

14  but that's one of the funniest -- that's why I thought it

15  was very funny that this phone call came in today.

16      PROSPECTIVE ADVERTISER: I'll see if I can -- yes, I

17  got a -- personally I've got to check with my calendar,

18  you know?

19      VIAMEDIA REP.:  That's cool.  That's cool.

20      PROSPECTIVE ADVERTISER: But, yeah.

21      VIAMEDIA REP.:  So what other questions -- basically

22  also one of the things basically that I want you to know

23  going on and then you can formulate some more questions

24  about what it is that you need -- what your needs are

1    because I want to make sure that, You know, you're moving

2    in the right direction and you're comfortable with the

3    decisions you're making to utilize cable and how you're

4    utilizing it.

5        People use cable for several different factors.

6    There's four main factors that we, you and I, control.

7    After that, it's up to the consumer, how good your

8    business is, how good your sales people are, so on and so

9    forth.

10    PROSPECTIVE ADVERTISER: Right.

11    VIAMEDIA REP.:  And word of mouth.  The four main

12    factors are frequency, meaning the number of times a year

13    your spot is seen, okay?  Length of schedule, meaning You

14    can have -- and You have to marry those two quite closely.

15     You need -- You could have one spot an hour all day long

16    for one day and not get any business or you could have one

17    spot a day for 365 days a year.  So we have to figure out

18    when, what your business cycles are --

19    PROSPECTIVE ADVERTISER: Uh-huh.

20    VIAMEDIA REP.:  -- and when is the best time to

21    promote the business, what type of businesses you want to

22    promote, what types of business you want to promote in

23    terms of what your specialties are.  So those are two.

24    The third thing is hyper targeting which is the main

1  reason why cable might be good for you.  The hyper

2  targeting means You could take the individual that has a

3  household income plus of $100,000 that live on the upper

4  east side of Manhattan, upper west side of Manhattan, in

5  Morgan County New Jersey and in Suffolk, Long Island and

6  reconnect --

7       PROSPECTIVE ADVERTISER:  (unintelligible) that tight,

8  huh?

9       VIAMEDIA REP.:  You can trim it down that tight.  You

10  could also trim it down by if you think it's -- like I

11  don't know in terms of catering to -- is it more male

12  oriented, is it more female oriented, maybe we run, you

13  know, 50/50, some female program.  Do you want to be in

14  more news program?  Now that's my job to help you find out

15  which programs are going to reaching the consumer that

16  you're trying to reach.  So, what I need to get from you -

17  -

18       PROSPECTIVE ADVERTISER: That's the thing.

19       VIAMEDIA REP.:  Exactly.  I think you to really think

20  about who it is that you're going to be selling to.

21       PROSPECTIVE ADVERTISER:  Right.

22       VIAMEDIA REP.:  And that is the person we can get

23  down to within a half hour and put two spots, one at the

24  top of the hour and one at the bottom of the hour and

1   you're still only going to be paying $25 to $50 for a 30

2   second spot.

3        If you wanted to do a baseball spot, for instance,

4   you know, we could predict the Yankees spot, I mean, not

5   in the playoffs but we could probably get the Yankee spots

6   for $100 on our CN and so on and so forth.  Not

7   (unintelligible) certain different restrictions that we

8   have to talk about in terms of who we insert on -- insert

9   -- what I mean by insert is we actually are able to air a

10  commercial.  Because currently, Verizon FiOS does not

11  insert on any of the regional sports networks but they

12  will be doing so.  But in Manhattan, we represent a

13  company that does.

14       PROSPECTIVE ADVERTISER: Oh, I see.  Okay.  So you

15  could get me into stuff other than Verizon FiOS based on

16  what my needs are.

17       VIAMEDIA REP.:  Exactly.

18       PROSPECTIVE ADVERTISER: Okay.

19       VIAMEDIA REP.:  We represent -- we not only represent

20  Verizon FiOS, PD, we also represent a -- the other cable

21  entity in Manhattan other than Time Warner, which is

22  called RCN Cable.  There's a total of about 66,000

23  subscribers in and around Manhattan and Queens.  We

24  represent about ten percent of what Time Warner would be.

1  So if people's businesses are on the island of Manhattan

2  or specifically in Queens, so I would suggest that

3  depending upon what we decide to do moving forward, we

4  would place some -- all of the stocks on RCN and within

5  the RCN footprint because that's what makes sense.

6      PROSPECTIVE ADVERTISER: Okay.

7      VIAMEDIA REP.:  You know, because you're trying to

8  reach people in that area.

9      PROSPECTIVE ADVERTISER: Okay.

10     VIAMEDIA REP.:  So those are the things that you need

11 to start thinking of now based on what your business is.

12 YOU have to start looking at also other advertising

13 opportunities, other advertising mediums.

14     PROSPECTIVE ADVERTISER: Right.

15     VIAMEDIA REP.:  You should probably look at, you

16 know, different types of periodicals.  You'll find

17 something like an AM New York to put a three-quarter page

18 ad is probably going to be about $450 an ad.

19     PROSPECTIVE ADVERTISER: Uh-huh.

20     VIAMEDIA REP.:  You know, you want to be in the New

21 York Times, you're looking at a minimum of $17,000 for a

22 Tuesday afternoon.

23     PROSPECTIVE ADVERTISER: Yeah.

24     VIAMEDIA REP.:  It is absolutely, totally

1    tremendously expensive.  But if you have $17,000 you want

2    to (unintelligible) ad, God bless you, you know?  But

3    these are some of the things that you need to be thinking

4    of.

5         Oh, and the last thing, you have reach -- you have

6    the number of spots, you have the hyper targeting and last

7    but not least, you talked about it at the beginning of the

8    conversation, you have the message.  What's your call to

9    action?  What is it that you're going to show people?

10   What is it that you have them do?  Are you going to have

11   them go to your website?  Are you going to have them make

12   a phone call?  I mean, what is it that you are going to --

13   what is your call to action?

14        Those are the things that you need to start

15   thinking of now; who your consumer is, who your customer

16   is.  And then also, what are your expectations?  What are

17   you looking to gain from advertising with -- advertising

18   on these people?

19   PROSPECTIVE ADVERTISER: Uh-huh.

20   VIAMEDIA REP.:  And once you start really thinking

21   about all of this and digesting it, then what I can do is

22   ask you some more questions about who that individual is,

23   come up with -- You also have to obviously think about

24   budgets and finances and how much is going where, so on

1   and so forth.  And once you really get a handle on who

2   your consumer is, whether -- what your media mix is going

3   to be, then what I would like to do is maybe sit down in

4   person and discuss what we have.  I mean, I could send you

5   some maps, so on and so forth, so You know where we're at

6   and numbers.  But based on what we discuss, then we could

7   create some next steps.

8       PROSPECTIVE ADVERTISER: Okay.

9       VIAMEDIA REP.:  Does that sound okay?

10      PROSPECTIVE ADVERTISER: Yeah, that sounds good.  I --

11      VIAMEDIA REP.:  Okay.

12      PROSPECTIVE ADVERTISER: I would probably want to

13  review some of the material --

14      VIAMEDIA REP.:  Absolutely.

15      PROSPECTIVE ADVERTISER: -- like what you're talking

16  (unintelligible), where you're located, you know, the maps

17  and then you were saying like the rates could be different

18  on various different networks and you could tell me like

19  who I could reach.  Where you have that and that you could

20  kind of -- so I could talk it over with my partners about

21  -- you know, because different times of the year, you --

22  you're actually right on the ball.  I mean, different

23  times of the year we do different kinds of things.  We're

24  coming up to the holidays now, that's different from what

1  we might do in the wedding season.

2      VIAMEDIA REP.:  Okay.

3      PROSPECTIVE ADVERTISER: In the spring, you know, and

4  summer parties and --

5      VIAMEDIA REP.:  Oh, we would have separate copy also.

6      PROSPECTIVE ADVERTISER: Oh, yeah, yeah, exactly.  So

7  you know, and my buddy who is doing the video production,

8  he's like telling me how we could have this -- the major

9  part of the commercial kind of standard but then --

10      VIAMEDIA REP.:  That's a donut.

11      PROSPECTIVE ADVERTISER:  Yes, is that what you call

12  it?

13      VIAMEDIA REP.:  That's fine.

14      PROSPECTIVE ADVERTISER: A donut?

15      VIAMEDIA REP.:  It's called a donut where you have a

16  2010 or you have a donut in the middle where the beginning

17  or the end where the commercial are pretty much the same.

18  So that you keep that branding feel, so people know --

19  what is the name of the business, by the way, [name of

20  prospective advertiser]?

21      PROSPECTIVE ADVERTISER: It's A Matter Of Taste.

22      VIAMEDIA REP.: It's A Matter Of Taste.  I like that.

23   So people could know, It's A Matter Of Taste.  So, for

24  instance, you know, Intel -- boom, boom, boom, boom.

```
 1        PROSPECTIVE ADVERTISER: Yeah, right, exactly.  Yeah.

 2        VIAMEDIA REP.:  Do you know what I mean?  People know

 3    what that is --

 4        PROSPECTIVE ADVERTISER: Right.

 5        VIAMEDIA REP.:  -- by Intel.  You know, it's -- I

 6    always like to talk branding.  If you look at the new --

 7        PROSPECTIVE ADVERTISER: Yeah, that's one thing I was

 8    sort of what I was thinking like it's like what do we want

 9    to convey?  We want to convey not just -- it's like it's a

10    total meaning.  You know, it's not just like

11    (unintelligible) but we've got good taste.

12        VIAMEDIA REP.:  Exactly.

13        PROSPECTIVE ADVERTISER: That's the image we're trying

14    to project.  YOU know, we want to be tasteful, you know?

15        VIAMEDIA REP.:  Exactly.

16        PROSPECTIVE ADVERTISER: So -- so you get it.  So --

17    but yes, so I would want to get a sense because this --

18    I'm kind of like overwhelmed.  You've given me an awful

19    lot of information to think about and I'm in the middle of

20    a zillion other things, too.

21        VIAMEDIA REP.:  That's fine.

22        PROSPECTIVE ADVERTISER: But, you know, what I'm

23    trying to get is just a sense of what we can afford, what

24    my backers can afford, you know?
```

October 2, 2006                                                        24

```
 1        VIAMEDIA REP.:  Uh-huh.

 2        PROSPECTIVE ADVERTISER: Because I am not in this

 3   alone.

 4        VIAMEDIA REP.:  Okay.

 5        PROSPECTIVE ADVERTISER: And, you know, the --

 6   ultimately like what the value is.

 7        VIAMEDIA REP.:  Uh-huh.

 8        PROSPECTIVE ADVERTISER: So, yeah, if you could give

 9   me some background information to start with about, you

10   know, the size of --

11        VIAMEDIA REP.:  Okay.

12        PROSPECTIVE ADVERTISER: -- your subscriber base.

13        VIAMEDIA REP.:  Uh-huh.

14        PROSPECTIVE ADVERTISER: How the different networks

15   line up, you know?

16        VIAMEDIA REP.:  Okay.

17        PROSPECTIVE ADVERTISER: What the audiences are like.

18        VIAMEDIA REP.:  The basic audience.

19        PROSPECTIVE ADVERTISER: And -- exactly.

20        VIAMEDIA REP.:  I mean, it's pretty -- what I am

21   going to do is let's take one step at a time.

22        PROSPECTIVE ADVERTISER: Uh-huh.

23        VIAMEDIA REP.:  Because I know that I've given you a

24   lot of information and a lot of things to talk -- to think
```

1   about.

2       PROSPECTIVE ADVERTISER: And I like things kind of --

3       VIAMEDIA REP.:  I would --

4       PROSPECTIVE ADVERTISER: -- like in front of me, so I

5   can kind of like --

6       VIAMEDIA REP.:  Absolutely.

7       PROSPECTIVE ADVERTISER: -- have it right in front of

8   me and look at it, so --

9       VIAMEDIA REP.:  I agree with you 100 percent.  My

10  direct boss who is the senior vice president of New York,

11  he's a general manager, he's very numbers oriented.  I'm

12  somewhat more oriented but he can do it in his head.  I

13  need to see it.  So I understand exactly where you're

14  coming from.

15      I will send you a list of networks.

16      PROSPECTIVE ADVERTISER: Uh-huh.

17      VIAMEDIA REP.:  Okay?  I will also send you a few

18  that we have in terms of what the major -- the

19  (unintelligible) and Spike TV.  If you know Spike TV, it's

20  you know, the men 18 to 24.  Oxygen network -- there's

21  some networks that have -- I will see if I can find a list

22  of the networks on the left hand side and who they reach.

23   And I will see if I can get something like that.  If not,

24  I could definitely put something together like that for

1  you.

2      PROSPECTIVE ADVERTISER: Okay.

3      VIAMEDIA REP.:  So you'll have a list of the networks

4  that we do insert.

5      PROSPECTIVE ADVERTISER: Okay.

6      VIAMEDIA REP.:  And then I will --

7      PROSPECTIVE ADVERTISER: I just need like because you

8  were talking about like you know, what the range is like

9  anywhere from $25 to $50.

10     VIAMEDIA REP.:  Exactly.  Well that's going to be

11 depending upon -- it won't be anything -- you know, what

12 we'll do is we'll put something together, so I will make

13 it easy for you so you'll say, you know, I am not going to

14 say prime time on CNN is $50 and prime time on Spike TV

15 just to say is $20.  We can go that route but right now,

16 because we are growing and we are new, we have the

17 inventory so we can come up with a base rate for basically

18 any time period, any network, as long as it's not a

19 special and a Monday Night Football type of thing.

20     So, the reason why I give you that range of $25 to

21 $50 is you could then say -- and I will tell you now,

22 you'll probably have to run it anywhere between 300 to 500

23 units a month, in order to make it, you know -- or maybe

24 100 units a month at a couple of -- You know what I mean?

```
 1    Four to six networks and that's something that we'll talk

 2   about based on what your needs are and what your

 3   expectations are.  And what you are trying to convey.

 4        PROSPECTIVE ADVERTISER: Uh-huh.

 5        Q.   So you know, from a budget perspective, we could

 6   put something together for anywhere between, you know,

 7   $2,000 to $5,000 -- you know, to as much as you want.  YOU

 8   know?  So there might be some months where You run -- You

 9   know, maybe we'll do something where you purchase a bank

10   of stocks, meaning you want a bank of 10,000 units that

11   you are going to run next year and you figure out, based

12   on how your season is that you want to run X amount this

13   month and X amount that month and we change it as we go

14   along based on what your needs are.

15        PROSPECTIVE ADVERTISER: Uh-huh.

16        VIAMEDIA REP.:  And then what you don't use, we

17   either credit back to you or carry over; kind of like

18   minutes on a cell phone.

19        PROSPECTIVE ADVERTISER: Oh, okay.

20        VIAMEDIA REP.:  You know, but I don't know what your

21   -- you  know, what we need to do is we need to talk a

22   little bit more about what your needs are and whether or

23   not you do actually have the marketing budget and how much

24   of that marketing budget you are going to look to go to.
```

1    You know, because eventually I would suggest also that you

2    talk to Time Warner and Cablevision and the other cable

3    systems if cable works for you.

4         Now we are -- we're going to end up being a lot less

5    money because we're reaching a lot less people.  We're

6    also reaching people specifically within the marketing

7    areas that your business is and for your marketing tool.

8    And so, for instance, if you run one spot on Time Warner,

9    you might be getting 1.2 million people but you're getting

10   people in Connecticut and you don't need it.

11        PROSPECTIVE ADVERTISER: Right.

12        VIAMEDIA REP.:  Because nobody, you know --

13        PROSPECTIVE ADVERTISER: And also, you know, nobody --

14   they say what is it like 3 to 7 times you've got to see

15   something before it registers?

16        VIAMEDIA REP.:  Yeah.

17        PROSPECTIVE ADVERTISER: I know that's the way I am.

18        VIAMEDIA REP.:  Yes, it's --

19        PROSPECTIVE ADVERTISER: -- You know, but --

20        VIAMEDIA REP.:  -- generally the way I look through.

21    I like to say it's like 8 times because what I like to do

22   is I take -- there's two metaphors that I use.  I say --

23   well not metaphors, there's one thing -- people see the

24   commercial and then they watch the commercial and then

 1   they act on the commercial.  And I say, you know, people

 2   see the commercial twice then they watch the commercial

 3   twice and then they'll -- if there's a desire or a need

 4   for it, then they'll act on it.  But, you know, they'll

 5   see it 8 times and then they'll -- once they need

 6   catering, they'll say oh, It's A Matter Of Taste, can we

 7   call those people?

 8        PROSPECTIVE ADVERTISER: Uh-huh.

 9        VIAMEDIA REP.:  Also, within the message and this is

10   just something that will have to do with you know, your

11   video production friend, I don't know if -- do you watch

12   boxing at all?

13        PROSPECTIVE ADVERTISER: Uh, no.

14        VIAMEDIA REP.:  Have you ever seen boxing?

15        PROSPECTIVE ADVERTISER:  No.

16        VIAMEDIA REP.:  No?  Well if you watch a boxing

17   match, a boxer has three minutes -- there's three minute

18   rounds and there's one minute when the boxer goes back to

19   the corner, okay?

20        PROSPECTIVE ADVERTISER: Right.

21        VIAMEDIA REP.:  And in that one minute --

22        PROSPECTIVE ADVERTISER:  I've seen boxing enough for

23   that.  Yeah, that I know.

24        VIAMEDIA REP.:  Yeah, all right.

October 2, 2006                                                              30

```
 1        [Cross-talk]

 2        VIAMEDIA REP.:  I'm not going to (unintelligible)

 3   but I wouldn't be able to tell you that either.  But in

 4   terms of that, imagine the commercial being the boxer and

 5   when the boxer goes back to the corner, the trainer only

 6   has one minute to tell that person -- to tell the boxer

 7   what to do when they go back out.  Now imagine the boxer

 8   being the commercial and -- or not the commercial, the

 9   boxer being the consumer.  The consumer is out there and

10   they're getting bombarded and they're getting hit with all

11   of these messages.  These messages from everywhere; the

12   internet, the billboards, taxicabs, commercials,

13   commercials, commercials, commercials.  And you have 30

14   seconds to tell them what you want to tell them.

15        PROSPECTIVE ADVERTISER: Uh-huh.

16        VIAMEDIA REP.:  Generally, if you watch a boxing

17   trainer, she'll only tell them three things maximum --

18        PROSPECTIVE ADVERTISER: Uh-huh.

19        VIAMEDIA REP.:  -- in that 60 seconds because the

20   boxer is going to go back out there, just like the

21   customer that's going to go back out there and get

22   bombarded by more messages.  So as a suggestion, I usually

23   suggest to the video production people that they say --

24   that they don't give more than three things.
```

 1        PROSPECTIVE ADVERTISER: Uh-huh.

 2        VIAMEDIA REP.:  Because You can -- to give the person

 3   to do -- to give the consumer to do.  It would be the call

 4   of action, your name, and your location.

 5        PROSPECTIVE ADVERTISER:  (unintelligible).

 6        VIAMEDIA REP.:  Yeah.

 7        PROSPECTIVE ADVERTISER:  I get what you're saying but

 8   I am not even sure -- you know, I've got to see what he

 9   ordered is even (unintelligible) the commercial and then,

10   you know, then I will get into that.  But right now, I've

11   just got to see if the numbers --

12        VIAMEDIA REP.:  (unintelligible)  Okay.

13        PROSPECTIVE ADVERTISER: You know, so, you know, I

14   mean --

15        VIAMEDIA REP.:  What's --

16        PROSPECTIVE ADVERTISER:  This is good to, I mean,

17   give me a sense of what your subscriber base is and You

18   know, the different networks, I think that that's --

19   that's kind of where I need to start.  And again --

20        VIAMEDIA REP.:  Okay.

21        PROSPECTIVE ADVERTISER: I mean, I will be honest with

22   you, I am a little uncomfortable about the whole issue of,

23   you know, how many subscribers there are versus how many,

24   you know, are actually hooked up.  I mean, that's --

```
 1        VIAMEDIA REP.:  Uh-huh.

 2        PROSPECTIVE ADVERTISER: I mean, what did you say it

 3    was again?

 4        VIAMEDIA REP.:  Well currently, as of 6/30 there were

 5    60,994 in New Jersey and 53,883 in Queens.

 6        PROSPECTIVE ADVERTISER: That is what?  That is --

 7        VIAMEDIA REP.:  That is the actual, active number of

 8    subscribers.  There are 14,000 pending in New Jersey and

 9    11,000 pending in Queens.  Now that was as of 6/30.  So

10    you're looking at a total number of about 104,000 active

11    and 131,000 total and 26,000 pending.

12        PROSPECTIVE ADVERTISER: Okay.  And just to give me a

13    sense of perspective, who does that stack up against what

14    the other, you know, cable operators in those areas -- You

15    know, you were talking about going on Time Warner it's

16    going to be a lot more but how do you compare, how does

17    FiOS compare with its competitors of both of those areas?

18        VIAMEDIA REP.:  Well in terms of the number of

19    subscribers, you're looking at -- you know, you are

20    looking at a very small percentage of the overall market.

21     However, what we need to look at is where it is

22    specifically that you're looking for.  So for instance --

23        PROSPECTIVE ADVERTISER:  Say Long Island -- let's go

24    east and west.  Let's say Long Island and New Jersey.
```

```
 1        VIAMEDIA REP.:  We tend to be -- we tend to be --

 2   within the counties where we have subscribers?

 3        PROSPECTIVE ADVERTISER: Uh-huh.

 4        VIAMEDIA REP.:  We are no less than 15 percent or 10

 5   percent of that specific county.  Now we might not reach

 6   all of the counties in New Jersey but you don't need to

 7   reach Princeton.  Do you know what I mean?

 8        PROSPECTIVE ADVERTISER: Yes, okay.

 9        VIAMEDIA REP.:  So in Bergen County, we're in 25

10   percent of Bergen County.  And I can get you a list of the

11   perspective -- what percentage we are within those

12   counties.

13        PROSPECTIVE ADVERTISER: That would be awesome because

14   then I can compare apples to apples.

15        VIAMEDIA REP.:  Exactly.

16        PROSPECTIVE ADVERTISER: I mean, I get the point about

17   you've got to repeat things, so I get that and, you know,

18   I don't want to waste money on a very expensive spot to

19   reach a lot of people if it's like it never hits the

20   tipping point.  Do you know what I am saying?  I spend

21   like a lot of money but I don't get anyone because they

22   never heard it that one last time when it would sink in.

23        VIAMEDIA REP.:  Exactly.

24        PROSPECTIVE ADVERTISER: I would rather to a -- you
```

1   know, fewer people but have, like more of an impact on

2   those that I do reach.

3        VIAMEDIA REP.:  Exactly.  And you want to reach the

4   people where you want to reach them.

5        PROSPECTIVE ADVERTISER: Right, so that would be very

6   helpful to send me that information.

7        VIAMEDIA REP.:  Yes, if you could afford to buy more

8   spots in a smaller area because that's the area are that

9   you want to reach, it makes a lot more sense than buying

10  fewer spots in an area where you are going to reach people

11  that you don't have.

12       PROSPECTIVE ADVERTISER:  That's like okay --

13       VIAMEDIA REP.: Yeah.

14       PROSPECTIVE ADVERTISER: -- when we have start picking

15  up and, you know, we start getting (unintelligible) and we

16  expand and we hire more staff, you know, that's down the

17  road.  But I don't even know if I am -- I'm still on the

18  fence about it.  It's a big risk going into business on my

19  own.  I just --

20       VIAMEDIA REP.:  Uh-huh.  I understand.

21       PROSPECTIVE ADVERTISER: So it's just -- let me tell

22  you where to send this to because I've got a day -- oh, my

23  God, it's 4 o'clock.  All right.

24       VIAMEDIA REP.:  All right.  Cool.

1        PROSPECTIVE ADVERTISER: Send it to me.  The name is

2   [name of prospective advertiser], common spelling --

3        VIAMEDIA REP.:  [name of prospective advertiser].

4        PROSPECTIVE ADVERTISER: Yes.

5        VIAMEDIA REP.:  That's the owner of our company's

6   name also.

7        PROSPECTIVE ADVERTISER: Okay.  No relation.

8        VIAMEDIA REP.:  It's not [name of prospective

9   advertiser] but it's --

10       PROSPECTIVE ADVERTISER: I would have went straight to

11  him if I would have known.

12       VIAMEDIA REP.:  Yeah, you would have (unintelligible)

13  to him instead of coming to me.  Yes, go ahead.  [Name of

14  prospective advertiser].

15       PROSPECTIVE ADVERTISER: P.O. Box --

16       VIAMEDIA REP.:  Okay.  Can I e-mail it to you or I

17  will e-mail you also?

18       PROSPECTIVE ADVERTISER: No, just send it to me in

19  print.  Send it to my P.O. Box.

20       VIAMEDIA REP.:  Okay.

21       PROSPECTIVE ADVERTISER: P.O. Box 1211 --

22       VIAMEDIA REP.:  Uh-huh.

23       PROSPECTIVE ADVERTISER: East Elmhurst, New York.

24       VIAMEDIA REP.:  Okay.

```
 1        PROSPECTIVE ADVERTISER: 11370.

 2        VIAMEDIA REP.:  11370.  Cool.  And you have all of my

 3   information, right, Tom?

 4        PROSPECTIVE ADVERTISER: Yes.  [Name of Viamedia Rep.]

 5   -- I just want to get the spelling of your last name

 6   again.

 7        VIAMEDIA REP.:  [Name of Viamedia Rep.].

 8        PROSPECTIVE ADVERTISER: Okay.

 9        VIAMEDIA REP.:  And if you would do me a favor and

10   give me a call back when you have some time and that way I

11   can -- I'm trying to get some -- I have about 20 to 30

12   people that are coming over the house on the 22nd -- 25 to

13   15 people,  so --

14        PROSPECTIVE ADVERTISER: September 22, you said;

15   right?

16        VIAMEDIA REP.:  September.

17        PROSPECTIVE ADVERTISER: So, September.  And where --

18   where is it?

19        VIAMEDIA REP.:  87th and Amsterdam.

20        PROSPECTIVE ADVERTISER: So upper west side.  All

21   right.  Let me check that.  I will let you know.

22        VIAMEDIA REP.:  Yes, check your dates and Let me

23   know.  And give me a call back on that also.

24        PROSPECTIVE ADVERTISER: No later than like early next
```

October 2, 2006                                                    37

1    week, Monday or Tuesday.

2         VIAMEDIA REP.:  Yeah, that's fine.  That's absolutely

3    fine.  Thanks, [name of prospective advertiser].

4         PROSPECTIVE ADVERTISER: Thanks, [name of Viamedia

5    Rep.].

6         VIAMEDIA REP.:  Have a good weekend.  Bye.

7         PROSPECTIVE ADVERTISER: Bye-bye.

8    [Audio concludes]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

October 2, 2006                                                    38

```
 1                C E R T I F I C A T E

 2

 3        I, Linda Ferrara, certify that the foregoing

 4   transcript was prepared using DVD electronic

 5   transcription equipment and is a true and accurate

 6   record.

 7

 8                   _____
                     Linda Ferrara

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

# EXHIBIT

# 2

| | | Active | Pending | Total | Active increase | Pending increase | % Active |
|---|---|---|---|---|---|---|---|
| Q2 Final | Freehold (VHO 7) Total | 36,155 | 22,320 | 58,475 | 8,861 | 10,853 | 62% |
| June | Freehold (VHO 7) Total | 31,752 | 18,716 | 50,468 | | | |
| May | Freehold (VHO 7) Total | 29,568 | 13,094 | 42,662 | 32% | 95% | |
| April | Freehold (VHO 7) Total | 27,304 | 11,467 | 38,771 | | | |
| Q2 Final | Queens (VHO 5) Total | 41,714 | 15,739 | 57,480 | 7,341 | 10,045 | 73% |
| June | Queens (VHO 5) Total | 37,583 | 12,271 | 49,854 | | | |
| May | Queens (VHO 5) Total | 36,039 | 7,208 | 43,247 | 21% | 176% | |
| April | Queens (VHO 5) Total | 34,373 | 5,694 | 40,067 | | | |
| Q2 Final | NY DMA | 77,869 | 38,059 | 115,955 | 16,192 | 20,898 | 57% |
| June | NY DMA | 69,335 | 30,987 | 100,322 | | | |
| May | NY DMA | 65,607 | 20,302 | 85,909 | 26% | 122% | |
| April | NY DMA | 61,677 | 17,161 | 78,838 | | | |

# EXHIBIT

# 3

# Verizon FiOS

## Subscriber Households - NY DMA

| | NY (LI and Upstate) | LI Only | NJ | Total NY DMA |
|---|---|---|---|---|
| 1/11/2007 | 20,685 | 19,810 | 3,783 | 24,468 |
| 2/11/2007 | 25,099 | 23,348 | 13,967 | 39,066 |
| 3/11/2007 | 30,571 | 28,073 | 27,739 | 58,310 |
| 4/11/2007 | 37,018 | 32,103 | 35,018 | 72,036 |
| 5/11/2007 | 43,247 | 37,542 | 42,662 | 85,909 |
| 6/11/2007 | 49,854 | 42,768 | 50,468 | 100,322 |
| Current | 57,480 | 47,860 | 58,475 | 115,955 Up 374% since January |
| 2Q '07 PJ | 47,259 | 43,909 | 20,141 | 67,400 |
| 3Q '07 PJ | 70,831 | 65,331 | 43,653 | 114,484 |
| 4Q '07 PJ | 100,548 | 91,798 | 77,155 | 177,703 |

*Current as of 7/11/07

Note: End of 3Q DMA Projection already exceeded.

# Verizon FiOS

## Subscriber Households - NY DMA

| | NY (LI and Upstate) | LI Only | NJ | Total NY DMA |
|---|---|---|---|---|
| 1/11/2007 | 20,685 | 19,810 | 3,783 | 24,468 |
| 2/11/2007 | 25,099 | 23,348 | 13,967 | 39,066 |
| 3/11/2007 | 30,571 | 28,073 | 27,739 | 58,310 |
| 4/11/2007 | 37,018 | 32,103 | 35,018 | 72,036 |
| 5/11/2007 | 43,247 | 37,542 | 42,662 | 85,909 |
| 6/11/2007 | 49,854 | 42,768 | 50,468 | 100,322 |
| 7/11/2007 | 57,480 | 47,860 | 58,475 | 115,955 |
| Current* | 65,711 | 53,920 | 65,724 | 131,435 Up 437% since January |
| 2Q '07 PJ | 47,259 | 43,909 | 20,141 | 67,400 |
| 3Q '07 PJ | 70,831 | 65,331 | 43,653 | 114,484 |
| 4Q '07 PJ | 100,548 | 91,798 | 77,155 | 177,703 |

*Current as of 8/11/07

Notes: 2Q DMA PJ exceeded by 49%.
End of 3Q DMA PJ already exceeded by 15%.